# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Rogers Family Foods, LLC,                              Civil No. 19-1476 (DWF/ECW)

                    Plaintiff / Counterclaim
                    Defendant,

                                                       **MEMORANDUM OPINION**
v.                                                             **AND ORDER**

DFO, LLC,

                    Defendant / Counterclaim
                    Plaintiff.

_____

J. Michael Dady, Esq., and Kristy L. Miamen, Esq., Dady & Gardner, P.A., counsel for Plaintiff and Counterclaim Defendant.

Richard C. Landon, Esq., Lathrop GPM LLP, counsel for Defendant and Counterclaim Plaintiff.

_____

## INTRODUCTION

Plaintiff and Counterclaim Defendant Rogers Family Foods, LLC ("Plaintiff" or "RFF") is the operator of a Denny's diner in Rogers, Minnesota. From November 15, 1998 to November 15, 2018, RFF operated as a Denny's franchisee under a 1998 franchise agreement ("Franchise Agreement"). After the expiration of the Franchise Agreement, RFF sued Defendant and Counterclaim Plaintiff DFO, LLC ("Defendant" or "DFO") for a violation of the Minnesota Franchise Act ("MFA"), breach of contract and the implied covenant of good faith and fair dealing, and for a declaratory judgment that RFF has a contractual and statutory right to renew its 1998 Franchise Agreement for an

additional 20 years, or, alternatively, to enter into a new franchise agreement that is substantially similar, in all material respects, to the 1998 Franchise Agreement.

This matter is before the Court upon Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.  (Doc. No. 32.)  Plaintiff opposed Defendant's Motion for Summary Judgment.  (Doc. No. 39 ("Pl. Opp.").)  For the reasons set forth below, the Court grants in part and denies in part Defendant's motion for summary judgment.

## BACKGROUND

RFF asserts three claims against DFO:  (1) breach of the Minnesota Franchise Act, (2) breach of contract and the implied covenant of good faith and fair dealing, and (3) declaratory judgment that RFF has the contractual and statutory right to renew the Franchise Agreement for an additional 20 years, or, alternatively, to enter into a new Franchise Agreement that is substantially similar, in all material respects, to the Franchise Agreement.  (Doc. No. 25 ("Compl.").)[1]  DFO asserts two counterclaims against RFF: (1) declaratory judgment that DFO is not liable for a "failure to renew" under the MFA, and (2) declaratory judgment that RFF's partial transfer of ownership without the prior written consent of DFO is null and void, and constitutes a default that is grounds for termination.  (Doc. No. 26.)

DFO requests that all counts of the Complaint be dismissed.  (Doc. No. 32 at 1-2.) DFO also seeks declaratory judgment that it did not "fail to renew" the Franchise Agreement in violation of the MFA and that, if RFF had a right under the MFA to

---

[1]      The operative Complaint is the First Amended Complaint.  (*See* Doc. No. 25.)

continue under the terms of the expired Franchise Agreement, DFO has a right to terminate the agreement because of RFF's breach of the assignment provisions of the Franchise Agreement.  (*Id*. at 2.)

The facts relevant to this order are discussed below.

## I.    The Parties' Relationship

In November 1993, RFF's principal George W. Yankoupe showed Jeff Jennings, DFO's Director of Franchises at the time, RFF's potential site in Rogers, Minnesota.[2] (Doc. No. 42 ("Yankoupe Decl.") ¶ 3.)  At the time, RFF's affiliate entity owned and operated a traditional Denny's Restaurant in Plymouth, Minnesota.  (*Id*. ¶ 6.)

On November 15, 1993, Yankoupe wrote Jennings a letter, entitled "Site visit and 'Grandfathering' of site I-94 and Highway 101, Rogers, Minnesota."  (Doc. No. 42-1.) Yankoupe's letter stated that "Ted Smith assured us that the site is 'grandfathered' to Plymouth Family Foods, Inc. and that a reduction of the Franchise Fee may be achievable because the site is so strong."[3]  (*Id*.)  On January 19, 1994, Ted Smith, Denny's Real Estate Director at the time, wrote Yankoupe a letter stating that the Rogers site was "a pre-approved site for your development of a Denny's franchise Restaurant, but subject, of course to final approval of the project by our V.P. of Franchise Development."  (*Id*. ¶ 8.)

According to RFF, one "key inducement" for RFF entering into a franchise agreement was a communication by Denny's Lucy Clark, Coordinator of Franchise

---

[2]    At the time, RFF was negotiating with DFO, Inc.—DFO's predecessor.

[3]    Plymouth Family Foods, Inc. was RFF's affiliate entity at the time.  (*See* Doc. No. 42-2.)

Administration and Development.[4]  (*Id.* ¶ 9.)  According to Yankoupe, Clark told him that RFF's initial 20-year agreement would be extended for at least another 20 years on the same terms so long as RFF continued to capably perform.  (*Id.*)  Yankoupe states that this commitment included a six percent "lock" or "locked in" rate for the franchise fee.  (*Id.* ¶ 10.)  Yankoupe further states that this commitment was made because Denny's recognized that the Rogers location was a great site and that such a "lock" would be a "win" for both sides.  (*Id.* ¶ 11.)

On January 21, 1994, Yankoupe wrote to Smith to say that he was "pleased to see the enthusiasm that Jeff Jennings expressed for the [Rogers] site."  (Doc. No. 42-2.)  Yankoupe also wrote that Smith had previously described the Rogers site as a "slam dunk" and that Jennings had described the site as a "Grand Slam."  (*Id.*)  Yankoupe also stated that he "appreciate[d] [Smith's] comment that the site is ***so good Denny's should pay [RFF] the franchise fee***!"  (*Id.* (emphasis in original).)  On February 23, 1996, Yankoupe wrote C. Ronald Petty, DFO's President and CEO at the time.  (Doc. No. 42-3.)  In his letter, Yankoupe stated that he "certainly appreciated [Petty's] comments regarding holding the royalty to 6% on this site."  (*Id.*)

Due to highway reconstruction and a subsequent condemnation proceeding, RFF did not submit its formal application for a Denny's in Rogers, Minnesota until January of

---

[4]    The parties dispute the proper title for Lucy Clark.  DFO characterizes Lucy Clark as a "secretary to Steve Dunn, DFO's head of franchising" (Def. Memo. at 15) who merely had a clerical role (Reply at 11-12).  The deposition testimony that DFO cites in support of its characterization of Lucy Clark as a "secretary" states that, "back in the presigning of the 1998 franchise agreement," Clark's position was a franchise coordinator.  (*See* Doc. No. 35-4 at 77:5-77:23.)

1998.  (*Id.* ¶ 16.)  When RFF submitted its application, RFF included a required proforma for the site, which incorporated the agreed upon 6% franchise fee as one of RFF's ongoing costs.  (*Id.*)  By this time, Denny's had a new Director of Franchise Development named Mo Sawda.  (*Id.* ¶ 17.)  On March 12, 1998, RFF wrote to Sawda regarding the Rogers site.  (*Id.* ¶ 18.)  In the March 1998 letter, RFF noted that a "comparison of our basic operational characteristics, such as property tax, minimum wage, lack of 'tip credit' etc. to that of franchised Denny's in other states, indicates that we in Minnesota are clearly put at an immediate financial disadvantage:  thus, the intense discussion with you, by my partner, George Yankoupe, to identify and capture any cost savings for the Rogers' [sic] site."  (*Id.*)  RFF further stated that:

> With regard to this last point, we are still searching our files for the total paper trail that speaks to holding our site at 6%, versus the 7% royalty fee. . . .  Attached are several items of correspondence that refer to the site.  As stated during the meeting and as attested to in the correspondence, a long line of Denny's real estate specialists have sponsored this site.  In fact, the interest is best summarized by Ted Smith's comment that the site is "so good Denny's should pay us the franchise fee!"  Although Mr. Smith's comment was facetious, we do feel that the circumstances beyond our control which precluded our construction earlier warrant honoring the unwritten commitment by Denny's executives Ron Petty, Gaylon Smith and Vaughn Berg to hold the Rogers' franchise fee at 6%.

(*Id.*)

By this point in time, DFO had increased its franchise fees from 6% to 7% for new franchisees.  (*Id.* ¶ 19.)  As a result, DFO requested documentation of the agreed upon 6% franchise fee rate between itself and RFF.  (*Id.*; *see also* Doc. No. 42-5.)

On April 21, 1998, RFF sent a letter to Sawda that included a copy of a fax RFF received from Vaughn Berg, who was the previous Franchise Sales Director for Denny's. (Doc. No. 42-6 at 1.)  Berg's fax stated that, prior to Denny's change of the franchisee marketing contribution from 2% to 3%, "franchisees and prospects were notified of the impending change so they could sign agreements before the effective date of the larger contribution."  (*Id*. at 2.)  Berg stated that RFF asked for, and was granted, an extension of time to sign a franchise agreement for the Rogers site under the 2% contribution.  (*Id*.)  Berg stated that the extension was for "a time period through the condemnation proceeding plus site and franchisee approval time after the condemnation settlement date."  (*Id*.)

By the time RFF's proposed Rogers site could actually be built, RFF asserts that DFO desperately wanted a franchisee to open a "Classic Diner" concept in Minnesota. (Yankoupe Decl. ¶ 22.)  Despite having a traditional Denny's restaurant in Plymouth, Minnesota, RFF asserts that it opened a Denny's Classic Diner at the Rogers location based on DFO's promises and representations.  (*Id*. ¶ 23.)  By building a Classic Diner, RFF gave up a considerable amount of seating that it would have otherwise had if it had built a traditional Denny's restaurant.  (*Id*. ¶ 24.)  According to RFF, one key inducement for RFF's willingness to open a Classic Diner was Clark's promise that DFO's initial commitment to RFF would be extended for at least another 20 years so long as RFF continued to capably perform.  (*Id*. ¶¶ 25-26.)

## II.      The Franchise Agreement

In 1998, DFO, Inc. entered into a Franchise Agreement with RFF to operate a

Denny's franchise in Rogers, Minnesota.  (Doc. No. 35-1 ("Franchise Agreement").)

Daniel J. Hoffstrom and John Darkenwald, managing members of RFF, signed the

Franchise Agreement on behalf of RFF.  (*Id*. at DFO_00184.)  James W. Lyons, Vice

President of DFO, signed the Franchise Agreement on behalf of DFO, Inc.  (*Id*.)  The

term of the Franchise Agreement was a period of twenty years "commencing on the date

the Franchisee opens or takes over the Restaurant for business."  (*Id*. at ¶ 3.1.)  Because

RFF opened the restaurant on November 15, 1998, the Franchise Agreement was set to

expire on November 15, 2018.  (Compl. ¶ 2 n.1.)  The Franchise Agreement further states

that "[u]pon expiration . . . of this Agreement Franchisee shall have no right or option to

extend the term of the franchise granted in this Agreement."  (Franchise Agreement

¶ 3.1.)  The Franchise Agreement required RFF to pay certain fees during the term of the

agreement, including a 4% weekly royalty fee and a 2% advertising fee.[5]  (Franchise

Agreement ¶ 6.1.)

The Franchise Agreement includes a Minnesota-specific amendment ("Minnesota

Amendment").  (Franchise Agreement at DFO_00185-86 ("Minnesota Amendment").)

The MFA is incorporated by reference into the Franchise Agreement.  (*See id*.)  The

Minnesota Amendment states that "[i]f the [Franchise] Agreement contains a provision

---

[5]      The 3% marketing fee in the Franchise Agreement was crossed out and substituted
with a 2% marketing fee.  (Franchise Agreement ¶ 6.1(c).)  This change was initialed by
both parties.  (*Id*.; *see also* Yankoupe Decl. ¶ 21.)

that is inconsistent with the [MFA], the provisions of the [Franchise] Agreement shall be superseded by the [MFA's] requirements and shall have no force or effect."  (Minnesota Amendment ¶ 2.)

### III.   The Parties' Communications

On June 15, 2017, Elizabeth McAbee, DFO's Coordinator for Franchise Administration & Development, sent an email to Daniel Hoffstrom attaching a letter from DFO's Stephen Dunn, Senior Vice President, Chief Global Development Officer.  (Doc. No. 35-6 ("June 2017 Email").)  The email stated that it "attached a letter from Steve Dunn regarding your franchise agreements that expire in 2018."  (*Id*. at 1.)  The attached letter, dated June 6, 2017, was addressed to Daniel Hoffman at 13450 Rogers Drive, Rogers, MN 55374 ("June 2017 Letter").[6]  (*Id*. at 2.)

The June 2017 Letter stated, in part:

> Thank you for your continued dedication to Denny's.  The term of the Franchise Agreement for unit #7165 in Rogers, MN expires on November 15, 2018.  If you are in good standing, you may execute a new Franchise Agreement with a ten year (a Successor Franchise Agreement) or a twenty year (the standard Franchise Agreement) term. . . .  If you wish to continue operating your restaurant as a Denny's restaurant, please notify DFO in writing.  A failure to sign a new agreement will result in the expiration of your rights to operate your restaurant as a Denny's.

(*Id*.)  The June 2017 Letter also stated that "[t]he other terms of the successor and standard Franchise Agreements are set forth in our Franchise Disclosure Document,

---

[6]     RFF notes that this address is not the address specified in Section 21.3 of the Franchise Agreement.  (Pl. Opp. at 11 n.3.)

which you should have received last month.  The FDD is also available on the

mydennys.com website under Franchise Development, FDD."  (*Id*.)  The June 2017

Letter did not include a copy of either the successor or standard franchise agreement.

(*Id*.)

On March 8, 2018, DFF sent an email entitled "Expiration of Franchise

Agreement – Denny's #7165" to Hoffstrom ("March 2018 Email").  (Doc. No. 35-7

("March 2018 Email").)  The email included a list of information that DFO required from

RFF for RFF to apply for a Successor Agreement, including a "written request for either

a 10 or 20 year Successor Franchise Agreement."  (*Id*.)  The email further stated that

under the Successor Franchise Agreement RFF would be charged a 4.5% royalty rate and

a 3% Brand Building Fund rate.  (*Id*.)  The email also stated that "[n]o new agreement for

the restaurant will be issued until the BOH Scope has been completed and checked off by

[RFF's] Project Manager."  (*Id*.)  The parties disagree as to whether the March 2018

Email included a copy of the Successor Agreement.  (*See* Def. Memo. at 5; Pl. Opp.

at 11.)

On August 17, 2018, DFO sent another email to Hoffstrom entitled "Expiration of

Franchise Agreement #7165" ("August 2018 Email").  (Doc. No. 35-9 ("August 2018

Email").)  The August 2018 Email included the same information provided in the March

2018 Email.  (*Id*.)  After the August 2018 Email, Hoffstrom informed McAbee that RFF

wanted to continue as a Denny's franchisee and would like to schedule the BOH Scope.

(Doc. No. 35-10 ("September 2018 Email").)  On September 5, 2018, DFO thanked

Hoffstrom for letting DFO know that RFF was "interested in continuing operating

9

Denny's #7195 in Rogers, MN" ("September 2018 Email").  (*Id.* at 1.)  The September

2018 Email "acknowledge[d] the extension of [RFF's] current franchise agreement until

the approval process has been completed."  (*Id.*)  The September 2018 Email also

outlined terms that would be effective as of November 15, 2018, including an increase of

the marketing contribution from 2% to 3%, and an increase of the royalty from 4% to

4.5%.  (*Id.*)  The September 2018 Email asked Hoffstrom to "[p]lease let [McAbee] know

if you have any questions or need any additional information."  (*Id.*)

At some point in the fall of 2018, RFF arbitrated an ownership dispute between its

members.  (Doc. No. 35-11.)  On November 30, 2018, Hoffstrom sent an email to Angie

Kasparek, DFO's Business Consultant assigned to RFF.  (*Id.*)  Hoffstrom stated that he

was "writing this to follow up on your request for information about the arbitration."

(*Id.*)  Hoffstrom notified Kasparek that the Darkenwald Family was acquiring his

ownership in RFF and that Hoffstrom would no longer act as RFF's chief manager.  (*Id.*)

Hoffstrom indicated that there would be a limited transition period and that RFF should

communicate with Tom Darkenwald and George Yankoupe going forward.  (*Id.*)

On December 4, 2018, McAbee sent another email to Hoffstrom, reminding him

that DFO would need the information requested in the August 2018 Email to process the

"new agreement for unit #7165."  (Doc. No. 35-13.)  On the same day, McAbee also

reminded Hoffstrom that she needed the information requested in the September 2018

Email.  (Doc. No. 35-14.)  Later that day, Kasparek forwarded Hoffstrom's November 30

email to DFO's legal department.  (Doc. No.35-15.)

10

On December 13, 2018, DFO sent a Notice of Default to RFF.  (Doc. No. 35-16.)
The Notice of Default reminded RFF that the Franchise Agreement required RFF to have
a replacement in place within 120 days of Hoffstrom's departure date—March 30, 2019.
(*Id*.)  The Notice of Default also stated that RFF must "***immediately*** provide a plan to
assure proper operations of the Restaurant to Nader Talbezadeh."  (*Id*. (emphasis in
original).)

On January 23, 2019, Tom Darkenwald wrote to McAbee indicating that RFF was
still in transition from its ownership change and asked to review copies of the expired
Franchise Agreement, the proposed Successor Agreement, and DFO's Franchise
Disclosure Document ("FDD").  (Doc. No. 35-18.)  On January 24, 2019, McAbee
responded to Darkenwald with an email that attached the Franchise Agreement and a
standard successor agreement.  (Doc. No. 35-19.)  McAbee stated that the FDD was too
large for an email and, thus, would need to be mailed.[7]  (*Id*.)  McAbee also stated that
"since this agreement has expired, the unit's royalty and advertising rates increased
automatically to the current rates of 4.5% and 3% as of November 15, 2018."  (*Id*.)
McAbee stated that if RFF was interested in a Successor Agreement, RFF would need to
submit an application.  (*Id*.)

On February 26, 2019, DFO's Rachel Fowler-Gist sent an email to RFF to follow
up on the Notice of Default.  (*Id*., Ex. 20.)  Fowler-Gist reminded RFF that the Notice of
Default expires on March 30, 2019 and indicated that DFO had not received any

---

[7]     According to RFF, RFF has never received the FDD.  (Pl. Opp. at 13; Doc. No. 41
("Darkenwald Decl."), ¶ 3.)

information regarding the status of Hoffstrom's replacement.  (*Id*.)  By March 5, 2019, RFF had not replied to Fowler-Gist's email.  (Doc. No. 35-21.)

Also on March 5, 2019, Darkenwald emailed McAbee to ask if the parties could discuss the Franchise Agreement with legal counsel.  (Doc. No. 35-22.)  A conference call regarding the Franchise Agreement took place on March 8, 2019.  (Doc. No. 35-23.)  On March 12, 2019, counsel for RFF sent a letter to DFO outlining RFF's position regarding the MFA and the Franchise Agreement ("March 2019 Letter").  (*Id*.)  In the March 2019 Letter, RFF stated that DFO failed to provide the requisite notice of its intent not to renew the Franchise Agreement and, thus, RFF believed it was entitled to renew the Franchise Agreement for an additional 20 years.  (*Id*. at 2.)  RFF's counsel sent a second letter on the same day which outlined RFF's objections to the Successor Agreement.  (Doc. No. 25-5.)

On March 14, 2019, Tim Flemming, DFO's General Counsel, responded to RFF's letters and indicated that DFO would look into the allegations raised by RFF.  (Doc. No. 35-12.)  Flemming also stated that "[s]ince strict adherence to the franchise agreement is something you advocate, kindly look at provisions 17.3 and 17.6 concerning partial assignment and advise how your clients propose to address that."  (*Id*.)  On April 10, 2019, DFO sent RFF a letter through counsel, which outlined DFO's standard practice regarding its Successor Agreements ("Supplemental Notice of Nonrenewal").  (Doc. No. 35-24 ("Supplemental Notice of Nonrenewal").)  The Supplemental Notice of Nonrenewal stated that "Denny's hereby again provides you with written notice that it does not intend to and will not renew the 1998 Franchise Agreement."  (*Id*. at 2.)  The

Supplemental Notice of Nonrenewal indicated that the nonrenewal would become effective 180 days from the receipt of the notice. (*Id.*)

On March 18, 2019, RFF's counsel sent an email to Flemming regarding the Hoffstrom assignment. (Doc. No. 35-25.) RFF's counsel stated that it did not believe that the Hoffstrom assignment was an "assignment" under Section 17.3. (*Id.*) RFF's counsel acknowledged that Section 17.6 included "potentially applicable language" and that DFO "could argue" that RFF's redemption of Hoffstrom's interest triggered the requirements of Section 17.6. (*Id.*) However, counsel argued that DFO had been aware of the redemption of Hoffstrom's interest since at least August 17, 2018. (*Id.*) RFF's counsel asked if DFO wished to exercise the right to first refusal. (*Id.*) DFO declined to purchase Hoffstrom's interest. (Doc. No. 35-24.)

On June 5, 2019, Darkenwald emailed McAbee as a follow-up to RFF's request that the expired Franchise Agreement be renewed—either by renewing the Franchise Agreement for an additional 20 years or by a mutual agreement on amendments by the parties. (Doc. No. 41-4.) Darkenwald stated that RFF believed DFO's position was that it would only agree to renew the Franchise Agreement with a "substantially similar renewal Franchise Agreement if a court declares that Denny's is legally obligated to do so." (*Id.* at 2.) This lawsuit followed.

## DISCUSSION

### I.   Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009); *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). As the United States Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## II.    Analysis

### A.    Defendant's Motion for Summary Judgment

#### 1.    The Minnesota Franchise Act

The MFA states that:

> Unless the failure to renew a franchise is for good cause as
> defined in subdivision 3, paragraph (b), and the franchisee has
> failed to correct reasons for termination as required by
> subdivision 3, no person may fail to renew a franchise unless
> (1) the franchisee has been given written notice of the
> intention not to renew at least 180 days in advance of the
> expiration of the franchise; and (2) the franchisee has been

> given an opportunity to operate the franchise over a sufficient
> period of time to enable the franchisee to recover the fair
> market value of the franchise as a going concern, as
> determined and measured from the date of the failure to
> renew.

Minn. Stat. § 80C.14, subd. 4.  The MFA does not define what constitutes a "failure to renew."  DFO argues that it is not a "failure to renew" when a franchisee rejects an offer to enter into a new agreement with a franchisee on the same terms that are available to other similarly situated franchises.  (Def. Memo. at 19-20.)  Because the MFA prohibits a franchisor from failing to renew a franchise without good cause or the requisite notice, the Court first evaluates whether DFO's offer of a Successor Agreement constitutes a failure to renew.

DFO argues that there was no "failure to renew" because DFO offered to enter into a Successor Agreement with RFF.  (Def. Memo. at 19-20.)  DFO argues that the term "renew" does not require the offering of an identical contract or a contract that is "substantially similar" to the original contract.  (*Id*. at 28-31.)  RFF responds that the term "renew" requires a contract that is identical to the original contract, or a substantial equivalent.  (Pl. Opp. at 13.)  RFF argues that an offer of a new contract that contains substantial and material differences from the original contract constitutes a failure to renew.  (*Id*. at 27-32.)  RFF also argues that, despite DFO's contentions to the contrary, RFF never received a copy of the Successor Agreement.  (*Id*. at 11, 27.)

At this time, the Court concludes that it is not necessary to determine the meaning of the term "failure to renew."  Viewing the record in the light most favorable to RFF, the Court concludes that there are issues of material fact that preclude a finding that DFO did

15

not fail to renew, even under DFO's proposed interpretation of the term. In particular, the Court concludes that there is a dispute as to whether DFO ever provided a copy of the Successor Agreement to RFF. The Court concludes that a reasonable jury could find that RFF never received a copy of the Successor Agreement before November 15, 2018 and, thus, DFO never offered even a new agreement with a franchisee on the same terms that are available to other similarly situated franchises within the timeframe required by the MFA.

DFO also argues that, even if there was a "failure to renew," DFO had good cause for any such failure to renew. (Def. Memo. at 22-24.) DFO argues that the rates available in the Successor Agreement have been DFO's rates for all standard franchise agreements since 2014. (*Id*. at 22.) DFO argues that, in order to maintain fairness to its more than 1,600 franchise restaurants, DFO requires all franchisees entering into a Successor Agreement to pay these standard rates. (*Id*. at 23.) DFO further argues that it would be unfair to other franchisees if DFO were to allow RFF to pay a lower rate than any other franchisee in the country. (*Id*.)

RFF counters that the purported need for all DFO franchisees to pay the same rate does not constitute good cause. (Pl. Opp. at 33-35.) RFF argues that Minnesota Rule 2860.4400(B) allows franchisors to discriminate between franchisees when such discrimination is based on a reasonable ground. (*Id*. at 33.) RFF argues that RFF should not pay the standard rate because: (1) RFF took a big risk when it introduced a Denny's diner in Rogers, MN, (2) RFF's diner concept gives up a considerable amount of seating and, thus, also gives up significant potential income, (3) RFF's basic operational and

16

expense differences in Minnesota—compared to Denny's franchises in other states—places RFF at a financial disadvantage, (4) DFO agreed to the "locked in" rate of 6% on ongoing fees that RFF would pay to DFO, and (5) RFF became a "Denny's Star Training Restaurant" in July 2019, for which RFF does not receive compensation from Denny's. (*Id.* 33-34.)  RFF also argues that DFO's February 2020 10-K Annual Report indicates that rates for nontraditional locations may vary from DFO's standard rates.  (*Id.* at 34 (citing Doc. No. 40-10.)

DFO replies that the evidence in the record does not demonstrate that there is a distinction between a traditional Denny's franchise and a Denny's diner.  (Reply at 9-10.) DFO points to corporate testimony that "[f]rom Denny's point of view, there's absolutely no difference between the restaurant operated by [Rogers Family] and the restaurant operated by any other franchisee in the United States."  (*Id.* at 10 (citing Doc. No. 35-4 at 84:18-21); Doc. No. 35-2 at Interrogatory No. 13.).)  Thus, DFO argues that RFF cannot avoid summary judgment by asserting that RFF is unique.

The MFA prohibits the failure to renew "[u]nless the failure to renew is for good cause as defined in subdivision 3, paragraph (b), and the franchisee has failed to correct reasons for termination as required by subdivision 3."  Minn. Stat. § 80C.14, subd. 4. The MFA defines "good cause" to mean "failure by the franchisee to substantially comply with the material and reasonable franchise requirements imposed by the franchisor."  Minn. Stat. § 80C.14, subd.3(b).  The MFA lists several non-exclusive examples of such failures by the franchisee, including:  (1) the bankruptcy or insolvency of the franchisee; (2) assignment for the benefit of creditors or similar disposition of the

assets of the franchise business; (3) voluntary abandonment of the franchise business;
(4) conviction or a plea of guilty or no contest to a charge of violating any law relating to
the franchise business; or (5) any act by or conduct of the franchisee which materially
impairs the good will associated with the franchisor's trademark, trade name, service
mark, logotype, or other commercial symbol. *Id.*

To terminate a franchise for good cause, "franchisees must be given advance
written notice and an opportunity to correct any deficiencies prior to termination."
*Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 858 F.2d 1339, 1343 (8th Cir.
1988) (citing Minn. Stat. § 80C.14, subd. 3).)  Such notice must include "specific notice
of [the] delinquencies so that the franchisee can have a meaningful opportunity to cure
them."  *Culligan Int'l Co. v. Culligan Water Conditioning of Carver Cty., Inc.*, 56 F.
Supp. 265, 1270 (D. Minn. 1983).  This notice, however, is not required when the ground
for termination is either voluntary abandonment of the franchise or the failure to cure any
alleged violation that materially impairs the good will of the franchisor's trade name.
*Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, Civ. No. 19-02953,
2020 WL 1812501, at *15 (D. Minn. Apr. 2020) (citing Minn. Stat. § 80C. 14, subd.
3(a).)

Here, DFO does not argue that its purported good cause for any failure to renew
falls under any of the outlined examples in subdivision 3.  Accordingly, DFO's argument
that it had "good cause" boils down to an assertion that a requirement that all franchisees
pay the same standard rates is a material and reasonable franchise requirement.  Viewing
the record in the light most favorable to RFF, the Court concludes that there are issues of

material fact that preclude a finding that DFO had good cause for a failure to renew RFF's franchise.  In particular, the Court concludes that there are disputes as to (1) whether DFO actually requires all franchisees entering into a Successor Agreement to pay the same standard rates, and (2) whether DFO's purported need to have all franchisees pay the same standard rates is a material and reasonable franchise requirement imposed by DFO.

Defendant further argues that, even if there was a failure to renew and even if DFO lacked good cause, DFO provided more than 180 days' notice that DFO did not intend to renew RFF's franchise.  (Def. Memo. at 24-27.)  DFO points to its June 2017 Email, June 2017 Letter, and March 2018 Email as providing sufficient notice of DFO's intent not to renew.  (*Id.* at 24-25.)  DFO also argues that, because the parties agreed to continue under an interim agreement after the expiration of the Franchise Agreement, DFO's Supplemental Notice of Nonrenewal provided on April 10, 2019 terminates any right to relief beyond another 180 days of continued operation.  (*Id.* at 25-27.)  DFO argues that RFF has been allowed to continue under the terms of the Franchise Agreement for more than 500 days after the expiration of the Franchise Agreement and more than 350 days after receiving the Supplemental Notice.  (*Id.* at 27.)

RFF responds that none of the purported notices identified by DFO meet the written notice requirements of the MFA or the Minnesota Amendment.  (Pl. Opp. at 22-27.)  RFF argues that the June 2017 Email and June 2017 Letter did not provide notice of DFO's intention to not renew RFF's franchise.  (*Id.* at 22-24.)  RFF argues that the June 2017 Email and June 2017 Letter, at best, provided "notice of expiration."  (*Id.*)

RFF also argues that DFO's purported notices did not comply with the notice requirements under Section 21.3 of the Franchise Agreement. (*Id*. at 24-26.) RFF argues that Section 21.3 requires DFO to provide notice in person, by certified United States Mail, or by registered United States Mail. (*Id*.) The emails, RFF argues, do not satisfy Section 21.3's notice requirements. RFF also argues that the June 2017 Email, June 2017 Letter, March 2018 Email and Supplemental Notice all did not include a copy of the Successor Agreement. (*Id*. at 27.) RFF argues that August 2018 Email fails to meet the notice requirement because it was provided past the 180-day timeframe by which DFO was required to provide notice. (*Id*.) Finally, RFF argues that the Supplemental Notice does not satisfy the notice requirement because it was received after the expiration of the Franchise Agreement and, thus, was "too little, too late." (*Id*. at 19.)

DFO counters that RFF's focus on whether DFO's communications constituted sufficient notice is merely a distraction from the fact that RFF never responded to DFO's communications prior to the expiration of the Franchise Agreement. (Reply at 2.) DFO argues that RFF should not be allowed to take advantage of its refusal to engage with DFO prior expiration. (*Id*. at 2-3.)

Viewing the record in the light most favorable to RFF, the Court concludes that there are issues of material fact that preclude a finding that the June 2017 Email, June 2017 Letter, and March 2018 Email provided adequate notice of DFO's intention not to renew RFF's franchise. The subject lines of the June 2017 Email, June 2017 Letter, and March 2018 Email all reference the ***expiration*** of the Franchise Agreement. None of these purported notices include the terms "renewal," "nonrenewal," or any similar variant

20

in the context of the Franchise Agreement.  While DFO argues that these communications provided clear indication of DFO's intent not to renew, the Court concludes that whether these communications provided adequate notice is a disputed material fact that precludes summary judgment at this time.  Because the Court concludes that there are issues of material fact remaining related to the adequacy of the purported notice, the Court does not reach the issue of whether the purported notices satisfied the notice requirements of the Franchise Agreement.

Viewing the record in the light most favorable to RFF, the Court also concludes that there are issues of material fact that preclude a finding that the Supplemental Notice provided adequate notice of DFO's intention not to renew RFF's franchise.  In particular, the parties dispute whether the Franchise Agreement had already expired by the time of DFO's Supplemental Notice.  If the Franchise Agreement had already expired by the time of DFO's Supplemental Notice, then the Supplemental Notice could not satisfy the MFA's 180-day prior-notice requirement.

### 2.   Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

DFO argues that RFF had no contractual right to renew the Franchise Agreement on identical terms based on parol evidence that predated the Franchise Agreement.  (Def. Memo. at 31-32.)  DFO argues that RFF cannot contradict the clear terms of the Franchise Agreement based on a contradictory promise allegedly made by Lucy Clark. (*Id*. at 32.)

RFF argues that it has a contractual right to renew the Franchise Agreement of an additional twenty years for two reasons.  First, RFF argues that the Minnesota Amendment into the Franchise Agreement gives RFF a contractual right to renew the Franchise Agreement on identical terms.  (Pl. Opp. at 35.)  RFF argues that DFO's obligation to renew the Franchise Agreement is augmented by the implied covenant of good faith and fair dealing, which (according to RFF) requires DFO to renew the Franchise Agreement in a way that is consistent with the parties' historical oral and written communications.  (*Id*. at 35-36.)  Second, RFF argues that it has a contractual right to renew the Franchise Agreement on identical terms based on a promise by Lucy Clark and documents purportedly referencing DFO's promise.  (*Id*. at 39-40.)  RFF argues that the parol evidence rule does not prohibit consideration of its evidence because the contract is either ambiguous or silent on the meaning of the term "renew." (*Id*. 36-40.)

DFO responds that RFF has failed to provide contemporaneous documents that references the "capably perform" promise.  (Reply at 11.)  DFO also argues that the documents that describe the royalty rate as "locked in" or as "holding" the rate at 6% are not a reference to the "capably perform" promise.  (*Id*. at 12.)  DFO further argues that no franchisee could reasonably believe that Clark had authority to make such a purported promise.  (*Id*. at 11.)  DFO argues that the only evidence in the record regarding Clark's job duties is testimony from DFO's former General Counsel, who testified that Clark had always been in a clerical role.  (*Id*. at 11-12.)  DFO also argues that, to the extent RFF's contractual right to renewal is based on the Franchise Agreement's incorporation of the

22

MFA, RFF's purported contractual rights fail for the same reasons as its claim under the MFA fails. (*Id*. at 10-11). Finally, DFO argues that the plain terms of the Franchise Agreement limit the rates to the term of the Franchise Agreement and do not provide a right to extend the term of the franchise. (*Id*. at 13.) DFO also points to the Franchise Agreement's integration clause, which states that the agreement is "a complete and exclusive expression of their agreement and may not be contradicted by any other statement or understanding between the parties." (*Id*. (quoting Franchise Agreement ¶ 21.7).)

Section 21.10 of the Franchise Agreement provides that the agreement shall be governed by and construed under the laws of South Carolina. (Franchise Agreement ¶ 21.10.) Under South Carolina law, parol evidence is admissible to "show the true meaning of an ambiguous written contract." *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.*, 232 S.E.2d 20, 25 (S.C. 1977). When a contract is "silent as to a particular matter and because of the nature and character of the transaction an ambiguity arises," parol evidence may also be admitted to "supply a deficiency in the language of the contract and to establish the true intent and meaning of the parties." *U.S. Leasing Corp. v. Janicare, Inc.*, 364 S.E.2d 202, 205 (S.C. Ct. App. 1992). Whether a contract is ambiguous is an issue of law. *See Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 127 (4th Cir. 2019); *see also S.C. Dep't of Natural Res. v. Town of McClellanville,* 550 S.E.2d 299, 302-03 (S.C. 2001).

Regarding RFF's claim that it has a contractual right to renew the Franchise Agreement on identical terms based on the Franchise Agreement's incorporation of the

MFA, the Court concludes that summary judgment in favor of DFO is inappropriate.  The Court concludes that the Franchise Agreement incorporates the MFA into the Franchise Agreement via the Minnesota Amendment.  To the extent RFF is able to establish that DFO violated its obligations under the MFA, the Court concludes that RFF has a contractual right to renew that is congruent with the rights rendered by the MFA.  However, as discussed above, viewing the record in the light most favorable to RFF, the Court concludes that there are material issues of fact that render summary judgment in favor of DFO on RFF's MFA claim inappropriate.  Similarly, the Court concludes that summary judgment in favor of DFO on RFF's claim of a contractual right to renew under the MFA is inappropriate at this time.

Regarding RFF's claim that it has a contractual right to renew the Franchise Agreement on identical terms based on statements or conduct outside of the Franchise Agreement, the Court concludes that summary judgment in favor of DFO is appropriate.  In particular, the Court concludes that the Franchise Agreement unambiguously states that RFF's right to renew the Franchise Agreement is governed by the MFA.  The Minnesota Amendment specifically points to the MFA's provision on renewal, Minn. Stat. § 80C.14, subd. 4.  (Minnesota Amendment ¶ 2(a).)  As discussed above, the Minnesota Amendment explicitly states that any provision of the Franchise Agreement that is inconsistent with the MFA "shall be superseded by the [MFA's] requirements and shall have no force or effect."  (*Id*.)  Although RFF points to the meaning of the term "renew" as another source of potential ambiguity, the Court concludes that the meaning of the term "renew" under the MFA is an issue of statutory construction and, thus, a

24

matter of law.  *See LaFave v. State Farm Mut. Auto. Ins. Co.*, 510 N.W.2d 16, 18 (Minn. 1993).  Because the Franchise Agreement unambiguously incorporates the MFA and its renewal provisions and because the meaning of the term "renew" is a matter of law, RFF's attempt to introduce parol evidence to contradict or alter the unambiguous incorporation of the MFA and its renewal rights is impermissible.  *See Klutts Resort Realty*, 232 S.E.2d at 25.

Regarding RFF's claim that the implied covenant of good faith and fair dealing requires DFO to renew the Franchise Agreement on identical terms, the Court concludes that summary judgment in favor of DFO is appropriate.  Under South Carolina law, "there exists in every contract an implied covenant of good faith and fair dealing." *Boddie-Noell Properties, Inc. v. 42 Magnolia P'ship*, 544 S.E.2d 279, 284 (S.C. Ct. App. 2000).  However, "the implied covenant cannot be used to alter the express terms of the contract."  *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 625 (D.S.C. 2015).  As discussed above, the Franchise Agreement unambiguously incorporates the MFA and its renewal provisions.  Accordingly, the Court concludes that RFF cannot rely on the implied covenant of good faith and fair dealing to alter the renewal rights under the MFA.

### 3.    RFF's Claim for Declaratory Judgment

DFO argues that the Court should grant summary judgment for RFF's claim for declaratory judgment for the same reasons as Counts I (MFA) and II (Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing).  For the reasons discussed above, the Court denies DFO's motion for summary judgment for RFF's claim for declaratory judgment.

### B.      Defendant's Requests for Declaratory Judgment

In addition to seeking summary judgment on all of RFF's claims, DFO also seeks declaratory judgment that it did not "fail to renew" the Franchise Agreement in violation of the MFA.  For the reasons discussed above, the Court concludes that there are issues of material fact that preclude a finding that DFO did not fail to renew the Franchise Agreement in violation of the MFA.  Accordingly, the Court denies DFO's request for declaratory judgment on this issue.

DFO also seeks a declaration that, if RFF is correct that the MFA required DFO to extend the Franchise Agreement on identical terms, DFO has the right to terminate that agreement because RFF breached the transfer provisions of the Franchise Agreement. (Def. Memo. at 32-34.)  DFO argues that RFF did not seek DFO's prior written consent regarding the Darkenwald family's purchase of Hoffstrom's 50% interest.  (*Id*. at 33.) DFO argues that RFF withheld information regarding the change in ownership despite DFO's inquiries and DFO's Notice of Default that noted that RFF had no approved managers under the requirements of the Franchise Agreement.  (*Id*.)  DFO argues that this is an express violation of Sections 17.3 and 17.4 of the Franchise Agreement and constitutes grounds for termination.  DFO argues that RFF offer of the right of first refusal to DFO after the fact does not cure RFF's failure to obtain DFO's prior written consent for the ownership transfer.  (*Id*. at 33-34.)  Thus, DFO seeks a declaration that, if the MFA required DFO to extend the Franchise Agreement on identical terms, DFO has a right to immediately terminate that agreement due to RFF's alleged breach.  (*Id*. at 34; Reply at 14.)

26

RFF argues that any purported default related to the ownership transfer occurred after the expiration of the Franchise Agreement and, thus, cannot provide grounds for DFO to not renew the Franchise Agreement.  (Pl. Opp. at 40.)  RFF argues that the same is true for RFF's redemption of Hoffstrom's 50% ownership interest.  (*Id.*)  RFF also argues that DFO was aware of the redemption of Hoffstrom's interest but never objected to RFF's conduct.  (*Id.*)  RFF further argues that the Notice of Default did not satisfy the MFA's termination requirements.  (*Id.* at 41.)  Finally, RFF argues that DFO lacks good cause to terminate the Franchise Agreement because the restaurant is operationally sound.  (*Id.* at 42.)

Section 17.3 of the Franchise Agreement states, in the relevant part:

> In the event that Franchisee desires to assign all or any part of its rights, privileges and interests under this Agreement, Franchisee shall first offer such assignment to the Company by notifying the Company and shall provide to the Company such information and documentation relating to such proposed assignment as the Company may require.  The Company shall have the right to acquire said rights, privileges and interests of Franchisee by accepting the offer in accordance with said terms and conditions or equivalent cash.

(Franchise Agreement, ¶ 17.3.)

Section 17.4 of the Franchise Agreement provides that, if the Company does not exercise its right of first refusal, the Franchisee "shall thereafter have the right subject to the prior written consent of the Company, to make the assignment to another person, firm or corporation on the same terms and conditions as stated in the notice."  (*Id.* ¶ 17.4.)  Section 17.5 of the Franchise Agreement states that "[a]ny assignment or purported assignment of Franchisee's rights, privileges or interests under this Agreement without

27

the Company's written consent shall be null and void of no force and effect, and shall

constitute grounds for termination of this Agreement as provided in Section 18 hereof."

(*Id.* ¶ 17.5.)

Section 18 of the Franchise Agreement, entitled "DEFAULT AND

TERMINATION," states that "the Company shall have the right to immediately

terminate this Agreement after written notice to Franchisee" upon the occurrence of a list

of events, including "[f]ailure of Franchisee to comply with any standard or requirement

of this Agreement which is not otherwise covered in Section 18, after being given

notification thereof and a reasonable opportunity, which in no event need to be more than

thirty (30) days, to cure such default." (*Id.* ¶ 18.1.)  The Franchise Agreement also states

that "the Company shall have the right to immediately terminate this Agreement without

prior notice to Franchisee" upon the occurrence of a list of events, including "[a]ny

purported assignment, transfer or sublicense of this franchise, or any right hereunder,

without the prior written consent of the Company as set forth in Section 17." (*Id.* ¶ 18.2.)

Regarding termination, the MFA states that "[n]o person may terminate or cancel

a franchise except for good cause."  Minn. Stat. § 80C.14, subd. 3(b).  As discussed

above, the MFA defines "good cause" to mean "failure by the franchisee to substantially

comply with the material and reasonable franchise requirements imposed by the

franchisor imposed by the franchisor."  *Id.*  No person may terminate or cancel a

franchise unless the person has "given written notice setting forth all the reasons for the

termination or cancellation at least 90 days in advance of termination or cancellation" and

"the recipient of the notice fails to correct the reasons stated for termination or

cancellation in the notice within 60 days of receipt of the notice."  Minn. Stat. § 80C.14,

subd. 3(a).  Notice of termination, however, is "effective immediately upon receipt"

where the alleged grounds for termination or cancellation are voluntary abandonment of

the franchisee relationship, conviction of the franchisee of an offense directly related to

the business conducted pursuant to the franchise, or failure to cure a default under the

franchise agreement which materially impairs good will.  *Id.*  The Minnesota Amendment

explicitly states that any provision of the Franchise Agreement that is inconsistent with

the MFA "shall be superseded by the [MFA's] requirements and shall have no force or

effect."  (Minnesota Amendment ¶ 2.)  Accordingly, to the extent the Franchise

Agreement's termination provisions are inconsistent with the MFA's termination

requirements, the Court finds that the MFA governs the procedures for termination in this

case.

        Here, DFO does not argue that its purported ground for termination is based on

voluntary abandonment, conviction for an offense directly related to the business of the

franchise, or a failure to cure a default which materially impairs good will.  Instead, DFO

argues that it has a right to immediately terminate the Franchise Agreement because RFF

failed to follow the assignment provisions of the Franchise Agreement.  Accordingly,

DFO's purported ground for termination is subject to the MFA's good cause and notice

requirements.  Viewing the record in the light most favorable to RFF, the Court

concludes that there are issues of material facts that preclude a finding that DFO has the

right to immediately terminate the Franchise Agreement.  These factual disputes include

whether the Franchise Agreement's assignment provisions are material and reasonable

franchise requirements and whether, if the assignment provisions are material and reasonable franchise requirements, RFF failed to substantially comply with the assignment provisions. Moreover, the Court concludes that, even if RFF failed to substantially comply with the Franchise Agreement's assignment provisions, the MFA prohibits termination without notice unless the grounds for termination are based on the limited number of grounds discussed above. *See Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 858 F.2d 1339, 1343 (8th Cir. 1988) ("A franchise can only be terminated for 'good cause' and franchisees must be given advance written notice and an opportunity to correct any deficiencies prior to termination.") (citing Minn. Stat. § 80C.14, subd. 3); *Culligan Int'l Co. v. Culligan Water Conditioning of Carver Cty., Inc.*, 563 F. Supp. 1265, 1270 (D. Minn. 1983) ("[T]he Court finds that the Act requires a franchisor to give a franchisee specific notice of its delinquencies so that the franchisee can have a meaningful opportunity to cure them."). Accordingly, the Court denies Defendant's request for a declaratory judgment that DFO has the right to immediately terminate the Franchise Agreement.

## CONCLUSION

For the reasons discussed above, the Court finds that summary judgment in favor of DFO on RFF's claim for a violation of the MFA is inappropriate. The Court also finds that summary judgment in favor of DFO on RFF's claim for a breach of contract, as it pertains to the incorporation of the MFA, is inappropriate. The Court finds that summary judgment in favor of DFO on RFF's claim for a breach of contract, as it pertains to RFF's

claim of a contractual obligation outside of the MFA or under an implied covenant of good faith and fair dealing, is appropriate.

In addition, for the reasons discussed above, the Court denies DFO's request for a declaration that DFO did not "fail to renew" the Franchise Agreement in violation of the MFA. The Court also denies DFO's request for a declaration that DFO has a right to terminate the Franchise Agreement because of RFF's alleged breach of the assignment provisions.

The Court notes, however, victory at the summary judgment stage does not necessarily mean victory at trial. Although the Court concludes today that there are several issues of material fact remaining, the Court notes that it may be difficult for Plaintiff to prevail at trial based on the record currently before the Court. The Court further notes that this case is an unusual case because it appears that, despite the ongoing litigation, the parties have chosen to continue their franchisor-franchisee relationship. Thus, the Court finds it difficult to understand why the parties are unable to resolve this dispute through negotiation.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. [32]) is **GRANTED IN PART** and **DENEID IN PART** consistent with the memorandum above as follows:

> 1.     The Court **DENIES** Defendant's Motion for Summary Judgment regarding Plaintiff's claim for a violation of the Minnesota Franchise Act;

2.      The Court **DENIES** Defendant's Motion for Summary Judgment regarding Plaintiff's claim for a breach of contract, as it pertains to the incorporation of the Minnesota Franchise Act;

3.      The Court **GRANTS** Defendant's Motion for Summary Judgment regarding Plaintiff's claim for a breach of contract, as it pertains to any contractual obligation outside of the Minnesota Franchise Act and under an implied covenant of good faith and fair dealing;

4.      The Court **DENIES** Defendant's Motion for Summary Judgment regarding Defendant's counterclaim for declaratory judgment that DFO did not "fail to renew" the Franchise Agreement in violation of the Minnesota Franchise Act; and

5.      The Court **DENIES** Defendant's Motion for Summary Judgment regarding Defendant's counterclaim for declaratory judgment that DFO has a right to terminate the Franchise Agreement because of RFF's alleged breach of the assignment provisions.


Dated:  September 30, 2020            s/Donovan W. Frank
                                      DONOVAN W. FRANK
                                      United States District Judge